438 S.E.2d 338

STATE of West Virginia ex rel. FAHLGREN MARTIN, INC., Petitioner Below, Appellee,

v.

Darrell V. McGRAW, Jr., Attorney General of the State of West Virginia, Respondent Below, Appellant,

Chuck Polan, Secretary of the Department of Administration of the State of West Virginia; and Ron Riley, Director of the Purchasing Division of the Department of Administration of the State of West Virginia, Respondents Below, Appellees.

No. 21820.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 22, 1993.

Decided Nov. 23, 1993.

Silas B. Taylor, Deputy Atty. Gen., Charleston, for appellant.

Larry A. Winter, David D. Johnson, III, Spilman, Thomas & Battle, Charleston, for appellee, Fahlgren Martin, Inc.

Clarence E. Hall, II, Pros. Atty. of Boone County, Sp. Atty. Gen. of State of WV, Madison, and Richard M. Riffe, Asst. Pros. Atty. of Boone County, Madison, and Diana Stout, Gen. Counsel to the Dept. of Admin. of State of WV, Charleston, for appellees, Chuck Polan and Ron Riley.

BROTHERTON, Justice:

This case is before the Court on the petition of the appellant, Attorney General Darrell McGraw, in which he submits that the writ of mandamus granted by the Circuit Court of Kanawha County on June 14, 1993, should be overturned. This case revolves around the bidding process for the advertising and related services contract for the West Virginia Lottery during 1993. Also at issue, although indirectly, is the 1991 Lottery advertising contract.

In order to address the issue of mandamus, we must first look at the circumstances surrounding the 1991 contract. In response to the Lottery's newspaper advertisements requesting bids for the 1991 Lottery advertising contract, six advertising agencies presented proposals to a seven-member evaluation committee in April, 1991. The evaluation committee was chaired by the Deputy Director of Marketing for the West Virginia Lottery, Tamara L. Gunnoe, several Lottery employees, an independent consultant, and an employee of Scientific Games, Inc., which was under contract to supply the Lottery with the lottery games.

Although the evaluation committee was to use a scoring system for each of the presenting agencies, subsequent information reveals that Fahlgren Martin, Inc., was not the recipient of the best score nor the lowest bidder. There was evidence that the Director of the Lottery, Elden "Butch" Bryan, had or-

dered the committee to make certain they recommended Fahlgren Martin, Inc., as the most "responsible" bidder to the Lottery Commission. Nonetheless, through various maneuverings and intentional misrepresentations by the evaluating committee and the Lottery Director, Fahlgren Martin, Inc., was awarded the bid.

In April, 1993, the Director of the Lottery, Elden "Butch" Bryan, was indicted on five felony counts by a federal grand jury. Among other counts, Bryan was indicted for federal mail fraud, which set out that the purpose of the scheme underlying the alleged mail fraud was to award the advertising contract for the Lottery to Fahlgren Martin, Inc., and to "subvert and conceal the results of a West Virginia Lottery bid and evaluation process to achieve that end." Following testimony that Bryan ordered that the bid results be falsified, he was convicted on five felony counts.

Immediately prior to the indictments, the 1993 Lottery advertising contract came up for the bidding process. There is no evidence that there was any irregularity in awarding the 1993 contract. However, two of the three Lottery employees who comprise the 1993 bid evaluation committee also were involved in the illegal 1991 evaluation process, as well as the same Lottery Director. In the 1993 process, Fahlgren Martin, Inc., received the highest score. Thereafter, a bid justification slip was prepared on March 17, 1993, by the Lottery Commission and the Purchasing Division of the Department of Administration. The bid justification slip stated that, in reliance upon documents submitted by the Lottery, the Purchasing Division "finds the scores to be mathematically correct and to have been submitted in accordance with purchasing regulations. Therefore we concur that the contract award be made to Fahlgren Martin, Inc."

On March 19, 1993, Administration Assistant Director Curtis formalized the Purchasing Division's approval by executing the first page of the purchase order. That purchase order and the underlying documents were forwarded to the Attorney General for his review, pursuant to W.Va.Code § 5A–3–13 (1993). The Code section requires that the Attorney General approve the contract as to form. While that review process was underway, the indictments discussed above were returned.

Thereafter, on May 5, 1993, the Attorney General advised Mr. Polan, Secretary of the Department of Administration, and Mr. Riley, the Supervisor of the Department of Purchasing, a division of the Department of Administration, that approval of the 1993 contract would be withheld pending resolution of the federal indictment against Bryan. The Attorney General stated that "until the criminal issue has been resolved … it would be remiss of this office to approve the contract and the purchase change request for the fiscal year 1993."

On May 14, 1993, Fahlgren Martin, Inc., filed a petition for a writ of mandamus in the Circuit Court of Kanawha County. On May 14, 1993, a show cause order was entered by the Circuit Court of Kanawha County, returnable June 11, 1993. In the petition before this Court, Fahlgren Martin, Inc., noted that the Attorney General then attempted to initiate massive discovery concerning the procurement of both the 1991 and 1993 contracts. "Specifically, [Attorney General] McGraw attempted to take the depositions of numerous persons, both parties and nonparties, and to compel the production of voluminous documents. Although [Attorney General] McGraw states that Fahlgren Martin, Inc., 'consistently opposed [his] efforts to develop the pertinent facts' Fahlgren Martin, Inc., actually sought only to prohibit discovery by [Attorney General] McGraw concerning evidence which was immaterial to the mandamus proceeding below." On June 4, 1993, Fahlgren Martin, Inc.'s motion to prohibit or limit discovery was granted by the circuit court. Thus, Attorney General McGraw was forbidden by the Circuit Court of Kanawha County from engaging in discovery pertaining to the process of the evaluation of bids for the 1991 or the 1993 contract.

On June 11, 1993, a hearing was held on Fahlgren Martin, Inc.'s petition for a writ of mandamus. Fahlgren Martin, Inc., contends that at that hearing, the evidence presented by Attorney General McGraw pertained only to the issue of whether the Attorney General

was entitled to withhold approval of the form of the 1993 contract pending a full blown investigation by his office concerning the legality of the procedures used in the awarding of that contract. The Attorney General's office was permitted to proffer that evidence, which included an avowal as to the substance of anticipated testimony.

On June 14, 1993, the circuit court entered the order from which the Attorney General appeals, granting the peremptory writ of mandamus as prayed for by Fahlgren Martin, Inc.[1] The writ of mandamus commanded the Attorney General to approve the 1993 contract as to form and required both Mr. Riley and Mr. Polan to finalize and give full force and effect to the 1993 contract with Fahlgren Martin, Inc. On June 15, 1993, the Attorney General filed a motion for a stay of execution pending appeal, which was granted by this Court. For reasons set forth below, we affirm the June 14, 1993, order of the Circuit Court of Kanawha County granting Fahlgren Martin, Inc.'s petition for a writ of mandamus.

The procedure to provide services to the State by contract is set forth in W.Va.Code § 5A–3–1 et seq. (1993). West Virginia Code § 5A–3–10 provides for the purchase and contract for commodities, printing, and services based, if possible, on competitive bids, when contracts exceed ten thousand dollars. West Virginia Code § 5A–3–11 provides for "purchasing in open market on competitive bids, if possible, for commodities, printing and services of ten thousand or less."

West Virginia Code § 5A–3–10 and 11 provide several basic steps which are required in the taking of bids for services. First, the bid request must be advertised.[2] Second, W.Va. Code § 5A–3–11 provides the lowest responsible bidder should be awarded the contract, taking into consideration "the qualities of the articles to be supplied, their conformity with specifications, their suitability to the requirements of the government and the delivery terms...."[3] Third, if the bids do not reach specifications, any or all bids may be rejected and the required items or services may be purchased on the open market if certain criteria are met. Fourth, duplicate copies of the bid proposals are required to be submitted to the Purchasing Division and to the State Auditor. The copies should be identical, and if there is any deviation, the bids may be rejected. Fifth, after the award of the contract or order, the director or specified person is to indicate upon the successful bid and its copy in the state auditor's office that it was the successful bid. Next, the copy is then to be maintained as a public record.

After the winning bid is determined, the contract is sent to the Attorney General. West Virginia Code § 5A–3–13 (1993) states that "contracts shall be approved as to form by the Attorney General. A contract that requires more than six months for its fulfillment shall be filed with the state auditor." If the Attorney General approves the contract as to form, then it is returned to the Purchasing Division for finalization. Once the contract is back in the Purchasing Division, it is determined whether there are funds available to pay for the contract. Once the funds are requisitioned, then the contract is completed and a purchase order is issued. The right of the Purchasing Division, as alleged in oral argument, to cancel a contract once it has been approved by the Attorney General is not an issue before this Court, and we do not make any findings in that regard.

1. Respondents Chuck Polan, Secretary of the Department of Administration, and Ron Riley, Director of Purchasing, did not appeal even though the peremptory writ of mandamus was awarded against them as well. When this matter first came on for argument before this Court, we ordered that Mr. Polan and Mr. Riley make a written response to the appealed order. A second argument date was set on November 4, 1993, to give Mr. Polan and Mr. Riley an opportunity to respond.

2. There are special regulations for boards of education and contracts for school buses and the purchase of products from nonprofit workshops.

3. This case is somewhat different. Determining a winning advertising agency is more subjective in nature and less amenable to merely determining the lowest bid. However, the same procedure should be followed with the winning bid being awarded to the lowest responsible bidder based on low price, quality, services provided, manpower, etc.

In the case now before us, the contract process for the 1993 Lottery advertising contract had reached the stage where it was sent to the Attorney General for approval as to form. Because of the federal indictment involving the 1991 advertising contract, the Attorney General halted the 1993 advertising contract when it reached his office and refused to approve the contract as to form until the criminal trial of the Lottery Director in federal court had been concluded. The Attorney General also indicated that he intended to start an investigation into the circumstances surrounding the award of the 1991 and 1993 advertising contracts. Fahlgren Martin, Inc., contended that the Attorney General exceeded his statutory authority by attempting to investigate the 1993 Lottery advertising contract, attempting to take depositions, and by refusing to approve the contract as to form. Thus, it filed the petition for a writ of mandamus in the Circuit Court of Kanawha County to force the Attorney General to approve the contract as to form.

The primary issue before this Court is to determine what authority the Attorney General is granted by constitution and statute to review contracts which come before him pursuant to W.Va.Code § 5A-3-13. The Attorney General contends that he has the authority, based upon his oath of office and the Constitution, to halt any contract which he believes to be illegal and to investigate any wrongful acts inherent in the contract. By contrast, the opposing parties contend that the legislature was very specific in its limitation of the Attorney General's authority and that the Attorney General is acting outside that authority. For the reasons stated below, we hold that the Attorney General has no authority to act upon contracts submitted to him pursuant to § 5A-3-1, *et seq.*, other than to review their form.

West Virginia Code § 5A-3-13 provides that "[c]ontracts shall be approved as to form by the Attorney General. A contract that requires more than six months for its fulfillment shall be filed with the state auditor." In *State ex rel. Bache & Co. v. Gainer,* 154 W.Va. 499, 177 S.E.2d 10 (1970), the Court stated that this Code section applies to contracts for commodities and printing purchased by the Director of Purchasing and to properties and supplies of the State. It does not apply to an agreement, such as a financial advisor's agreement, which relates to payment for services rendered in connection with the sale of bonds. A contract for advertising comes within this section, as do all contracts for service not otherwise exempted by statute or court opinion.[4]

The duties of the Attorney General are set forth in Article VII, § 1 of the West Virginia Constitution, which states that the Attorney General "shall perform such duties as may be *prescribed by law.*" (Emphasis added.) This Court has previously examined what powers are inherent in the office of Attorney General in *Manchin v. Browning,* 170 W.Va. 779, 296 S.E.2d 909 (1982). In *Manchin,* the Secretary of State sought a writ of mandamus to compel then Attorney General Browning to provide "agreeable legal representation" for the petitioner in federal court. The Court granted the writ after conducting an extensive review of the history of the Attorney General's office, both in England and in the United States, from 1776. Justice McGraw, now Attorney General McGraw, wrote for the court and concluded that the plain language of Article VII, § 1 of the West Virginia Constitution,

when viewed against the historical backdrop of the development of the office of Attorney General in the Virginias, leads us to conclude that the Attorney General of West Virginia does not possess the common law powers attendant to that office in England and in British North America during the colonial period.... The framers of the first Virginia Constitution in

---

4. West Virginia Code § 5A-3-14 states that a copy of all purchase orders shall be transmitted to the Director of the Finance Division so that the proper account could be encumbered before it was sent to the vendors. Except in emergencies, the Code provides that the contract or order should not be awarded until it had been certified to the director by the secretary or director of the budget that the unencumbered balance in the appropriation was sufficient to pay for the cost of the contract. In this case, the money comes from Lottery proceeds, and sufficient funds remain to pay for the contract.

effect abrogated any common law executive powers the holder of [the Attorney General's] office may have had....

*Id.* at 785, 296 S.E.2d at 915.

In this case, Attorney General McGraw argues that *Manchin* does not apply and that his duty to determine if there is any illegality involved in the contract was based upon his oath of office and the Constitution.[5] We cannot agree with this assessment. In *Manchin,* Justice McGraw explained that:

[b]y the provisions of our present constitution, the Attorney General is once again an officer of the executive department. However, his return to the executive department did not revive the common law powers of his office. The people of West Virginia specifically expressed their intent that the Attorney General should not exercise those powers by providing that he 'shall perform such duties as may be prescribed by law.' Under settled rules of construction, the word 'shall' when used in constitutional provisions is ordinarily taken to have been used mandatorily, and the word 'may' generally should be read as conferring both permission and power. *State ex rel. Trent v. Simms,* 138 W.Va. 244, 77 S.E.2d 122 (1953). The phrases 'prescribed by law' and 'provided by law' mean prescribed or provided by statutes. *Lawson v. Kanawha County Court,* 80 W.Va. 612, 92 S.E. 786 (1917). The plain effect of the provision is to limit the powers of the Attorney General to those conferred by law laid down pursuant to the constitution. Consequently we conclude that the powers and duties of the Attorney General are specified by the constitution and by rules of law prescribed pursuant thereto.

*Id.* at 785, 296 S.E.2d at 915.

After examining other jurisdictions, the Court in *Manchin* determined that "[t]he same reasoning has compelled numerous jurisdictions to hold that the Attorney General has no common law powers and duties where the constitutional provision which creates the office makes no specific grant of powers other than requiring him to perform such duties as are 'prescribed by law.'" *Id.* at 786, 296 S.E.2d at 916. The Court concluded that "[t]he powers and duties of the Attorney General are specified by the constitution and by rules of law prescribed pursuant thereto." *Id.* at syl. pt. 1. Although the facts behind this case and *Manchin* are different, the reasoning set forth in *Manchin* remains valid: because the Attorney General has no common law authority, his power is limited to what is conferred by law through statute and the Constitution. Because the Constitution confers only those powers "prescribed by law," we turn to the statute to see what powers have been granted by the legislature.

West Virginia Code § 5–3–1 (1979) provides the duties of the Attorney General:

The attorney general shall give his written opinion and advice upon questions of law, and shall prosecute and defend suits, actions, and other legal proceedings, and generally render and perform all other legal services, whenever required to do so, in writing, by the governor, the secretary of state,....

The legislature's limitation of the Attorney General's power is most evident in the statute creating the Purchasing Division, W.Va. Code § 5A–3–13. By stating that the contract shall be approved by the Attorney General "as to form only," it is obvious that the legislature intended that the Attorney General determine whether the form of the contract itself was proper. Further, the Attorney General's interpretation of the word "form" is erroneous. The term "form," as used in W.Va.Code § 5A–3–13, means the legality of all the matters contained in the contract document as it relates to the Constitution, statutes, and the contract law of this State. The term "form" does not include any

---

5. Article 4, § 5 of the West Virginia Constitution sets forth the oath of every person elected or appointed to office in this State. "Every person elected or appointed to any office, before proceeding to exercise the authority, or discharge the duties thereof, shall make oath or affirmation that he will support the Constitution of the United States and the Constitution of this State, and that he will faithfully discharge the duties of his said office to the best of his skill and judgment; and no other oath, declaration, or test shall be required as a qualification, unless herein otherwise provided."

matters extrinsic to the actual contract. Any other interpretation would contradict W.Va. Code § 5A–3–13. In fact, the legislature has refused, on four separate occasions since 1990, to enact legislation which would give the Attorney General investigatory and criminal prosecutorial powers.[6]

As the Court noted in *Manchin,* the Attorney General's statutory duty "does not authorize the Attorney General 'to assert his vision of state interest.' *Motor Club of Iowa v. Dept. of Transportation,* 251 N.W.2d 510, 514 (Iowa 1977)." 170 W.Va. at 790, 296 S.E.2d at 920. We believe this statement to be precisely on point. The legislature has done nothing since *Manchin* to authorize otherwise. As disappointing as it might be to any Attorney General, who is viewed as the chief legal officer for the State, the powers of the Attorney General are strictly defined by Constitution and statute.[7] This Court does not have the right to create powers which, based upon constitutional and legislative history, were never intended. Both the statute and the legislature have limited the Attorney General's power in cases involving state contracts.[8]

The oath of office for State officials requires that government officials swear or affirm to uphold the Constitutions of the United States and West Virginia. The Preamble to the West Virginia Constitution seeks to "promote, preserve and perpetuate good government" in the State of West Virginia for the common welfare, freedom and security of its citizens. However, contrary to the Attorney General's assertion, the constitutional intent to promote good government

does not grant the Attorney General the power or duty to investigate or prosecute potential illegalities in a contract. We conclude that neither the West Virginia Constitution nor the oath of office grants any additional powers which would contradict the statute or the legislature's refusal to grant the Attorney General any authority to prosecute or investigate alleged illegality in contracts which come before him.

Consequently, our Constitution and statutes limit the power of the Attorney General to seek out possible wrongdoing in State government. This may be a flaw in our system of government, although it is not this Court's place to make that determination. Nevertheless, it is a fact, and the Attorney General should not be criticized if and when such conditions exist and he is unable to act because of his limited powers. It is unfortunate that it must be the federal prosecutor who is called upon when it is necessary to investigate and prosecute wrongdoing in State government, when State and county agencies exist which certainly have similar powers, but refuse to, or do not, act. Certainly, the Attorney General does not fall into that category, because he is without power to act in such situations.

In order for a petition for a writ of mandamus to be upheld, three requirements must first be met. The relator must show "(1) a clear right to the relief sought; (2) a legal duty on the part of the respondent to do the thing relator seeks; and (3) the ab-

---

6. From 1990 to 1993, the legislature examined bills which would expand the power and authority of the Attorney General. These bills, however, were left to die in committee and no action has ever been taken which would grant the Attorney General prosecutorial powers. *See* H.B. 4582 (1990); H.B. 2497 (1991); H.B. 4165 (1992); H.B. 2766 (1993).

7. In *Manchin,* the Attorney General asserted that he was the "chief law officer of the State." The Court disagreed, determining that the Attorney General had no legislative mandate as a "law enforcement officer." Instead, the Court stated that "[i]n this context the Attorney General is more properly designated as the chief *legal* officer of the state, with the law as his area of special expertise. The Attorney General, as a complement to the Governor, is the chief 'law-

trained' officer of the state.... By the nature of his office, he is the general lawyer for the state, an office which he could not hold if he did not have the proper legal qualifications and were not admitted to the bar." *Id.* at 787, 296 S.E.2d at 917. The Governor was designated as the chief law officer of the State. This Court's decision in *Manchin* reflects the legislature's intent to limit the power of the Attorney General to that of the State's lawyer, rather than the State's law enforcement officer. Likewise, *Manchin* emphasizes that the Attorney General's office is not intended to "sniff out" illegality and enforce the law.

8. We do not address the Attorney General's authority in cases involving antitrust allegations, which is provided for by statute.

sence of another adequate remedy." Syl. pt. 2, in part, *Myers v. Barte,* 167 W.Va. 194, 279 S.E.2d 406 (1981).

■ In this case, the petitioner has shown a clear right to the relief sought and a legal duty on the part of the Attorney General. Although it is argued that the mandamus was premature because another adequate remedy exists in the Purchasing Division's ability to reject the contract at any time, we find the Department of Administration's role to be largely irrelevant in discussing the ripeness of the mandamus order. While part of the mandamus order is addressed to Mr. Polan and Mr. Riley, the main focus of the mandamus and this opinion is aimed at the Attorney General. Thus, it is the Attorney General's legal duties and other remedies with respect to the Attorney General which are at issue. Here, the only way to get the contract approved by the Attorney General's office was to require, as did the June 14, 1993, mandamus order of the Circuit Court of Kanawha County, that the Attorney General approve the contract as to form and send it back to Purchasing. Purchasing's official duties continue once the contract is back in their hands. Until that time, Purchasing's ability to reject the contract is irrelevant to the Attorney General's duty to approve the contract as to form. Therefore, we disagree with the assertion that this mandamus action is premature.

■ That said, we now focus our attention on the Department of Administration. Although the majority of this opinion is devoted to the Attorney General, the Department of Administration is not innocent in this scenario. Under W.Va.Code § 5A–3–10 and 11, the Department of Administration is in charge of the bidding process and is duty bound to see the process is performed according to statute. The delegation of their obligation to control the bidding process to the agency, the Lottery Commission in this case, is nothing short of a dereliction of duty. It is no wonder that possible corruption occurs when the chief watchdog of the State contract process does nothing but rubber stamp the agency's preference. Granted, the agency's opinion is important and should be solicited, but the agency should not run the process. However, during oral argument, counsel for Purchasing informed the Court that the lax procedures in effect at the time of the 1991 and 1993 contracts had been corrected and that Purchasing would strictly adhere to the statutory bidding process. We trust that is so, and that Purchasing will continue to do so in the future. After all, that is the purpose for their existence.

■ In order to remain within the statutory and constitutional requirements, the Attorney General must follow only a few simple steps. If the Attorney General has a reasonable belief that a problem exists regarding the form of a contract, the contract should be returned to Purchasing with the problems noted in writing for the Purchasing Division to review. If there is no problem with the form of the contract, as defined above, it must be approved and returned to Purchasing. If the Attorney General notices something that he believes to be illegal or improper outside the contract instrument itself, then he can notify Purchasing, in writing, of what he believes to be illegal, or notify the Prosecuting Attorney of Kanawha County of his concerns. He still must sign that contract if nothing is wrong with the form, as form is defined in this opinion.

The Attorney General is not being required to approve an illegal contract. The Attorney General approves only what he has a duty to review—the technical correctness of the contract. The term "form," as used in W.Va.Code § 5A–3–13, means the legality of all the matters contained in the contract document as it relates to the Constitution, statutes, and the contract law of this State. The term "form" does not include any matters extrinsic to the actual contract. He has no power to approve or disapprove anything else in the contract, and consequently, he is not approving an illegal contract.

■ The act of approving contracts as to form must be performed within a reasonable amount of time from the date the Attorney General receives the contract from the Department of Administration. It is hoped that this act of approval will be done promptly in the future so as not to require the Court to set a time limit within which the Attorney

General must act. State government should not be delayed because of arbitrary acts of any government official.

 In summary, we conclude that the West Virginia Constitution and the statute grants the Attorney General the duty to approve a contract as to form only. He has no authority to withhold approval if the contract as presented to him on its face—within the boundaries of the contract document—does not violate the Constitution or the laws of this State. If a contract meets the definition of form as set forth above, then he is required by statute to approve the contract, regardless of any perceived wrongful acts. The Attorney General may list perceived illegalities, in writing, for Purchasing or the Prosecuting Attorney to deal with once the contract is returned to Purchasing. The Attorney General cannot hold a contract in his office awaiting the outcome of a trial, investigation, or other proceedings. He has no investigative powers in connection with the contract. The Attorney General cannot sue on the contract on behalf of the State unless otherwise authorized by statute.

In this case, the Attorney General must send the Fahlgren Martin, Inc., contract, approved as to form, back to the Purchasing Division, if he has not already done so, and Purchasing must also approve the contract. We affirm the June 14, 1993, order of the Circuit Court of Kanawha County in toto. We do not address the issue of whether Purchasing has the authority, as it asserts, to cancel a contract at any time after it has performed the duties outlined by the mandamus order. Once Purchasing performs the duty set forth in the peremptory writ, it may proceed as it sees fit. That question was not before the Kanawha County Circuit Court and is not properly before this Court.[9]

Accordingly, we affirm the Circuit Court of Kanawha County's June 14, 1993, order granting the writ of mandamus.

Affirmed.

---

9. Lest the Attorney General's office cry foul and claim we are pushing through a tainted contract, we point out that at no point in this process has any evidence been presented to show that the 1993 contract was based upon a wrongful act. Unlike the 1991 contract, there is no evidence that the ratings process was tampered with by any Lottery employee. Vague, unspecified allegations do not a criminal act make. If the Attorney General has evidence of a wrongful act, it should be referred, in writing, to Purchasing or to the Kanawha County Prosecutor to be dealt with as needed. Further, we assume that the form of that contract is technically correct, because otherwise this Court is confident that Attorney General McGraw would have brought it to the attention of Purchasing.